UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

JASON M.,[1]                              )
                                          )
                Plaintiff,                )
                                          )
        v.                                )        No. 1:20-cv-03121-MG-SEB
                                          )
KILOLO KIJAKAZI, Acting Commissioner of the  )
Social Security Administration,           )
                                          )
                Defendant.                )

## ENTRY REVIEWING THE COMMISSIONER'S DECISION

In June 2017, Plaintiff Jason M. applied for disability insurance benefits ("DIB") from the

Social Security Administration ("SSA"), alleging a disability onset date of September 1, 2016.

[Filing No. 15-5 at 11-17.]  His application was initially denied on September 29, 2017, [Filing

No. 15-4 at 4-9], and upon reconsideration on January 31, 2019, [Filing No. 15-4 at 12-17].

Administrative Law Judge Dennis Hansen (the "ALJ") conducted a telephonic hearing on July 14,

2020.  [Filing No. 15-2 at 32-51.]  The ALJ issued a decision on August 4, 2020, concluding that

Jason M. was not entitled to receive benefits.  [Filing No. 15-2 at 16-26.] The Appeals Council

denied review on October 16, 2020.  [Filing No. 15-2 at 2-4.]

On December 3, 2020, Jason M. filed this civil action asking the Court to review the denial

of benefits according to 42 U.S.C. § 405(g).  [Filing No. 1.]  The parties consented to the

---

[1] To protect the privacy interests of claimants for Social Security benefits, consistent with the
recommendation of the Court Administration and Case Management Committee of the
Administrative Office of the United States courts, the Southern District of Indiana has opted to use
only the first name and last initial of non-governmental parties in its Social Security judicial review
opinions.

jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  [Filing No. 11.]

## I.
### STANDARD OF REVIEW

"The [SSA] provides benefits to individuals who cannot obtain work because of a physical or mental disability." *Biestek v. Berryhill*, __U.S.__, 139 S. Ct. 1148, 1151 (2019).  Disability is the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." *Stephens v. Berryhill*, 888 F.3d 323, 327 (7th Cir. 2018) (citing 42 U.S.C. § 423(d)(1)(A)).

When an applicant appeals an adverse benefits decision, the Court's role is limited to ensuring that the ALJ applied the correct legal standards and that substantial evidence exists for the ALJ's decision. *Id.*  For purposes of judicial review, "substantial evidence" is such relevant "evidence that 'a reasonable mind might accept as adequate to support a conclusion.'" *Zoch v. Saul*, 981 F.3d 597, 601 (7th Cir. 2020) (quoting *Biestek*, 139 S. Ct. at 1154).  "Although this Court reviews the record as a whole, it cannot substitute its own judgment for that of the SSA by reevaluating the facts, or reweighing the evidence to decide whether a claimant is in fact disabled." *Stephens*, 888 F.3d at 327.  Reviewing courts also "do not decide questions of credibility, deferring instead to the ALJ's conclusions unless 'patently wrong.'" *Zoch*, 981 F.3d at 601 (quoting *Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017)).  The Court does "determine whether the ALJ built an 'accurate and logical bridge' between the evidence and the conclusion." *Peeters v. Saul*, 975 F.3d 639, 641 (7th Cir. 2020) (quoting *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014)).

The SSA applies a five-step evaluation to determine whether the claimant is disabled. *Stephens*, 888 F.3d at 327 (citing 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4)).  The ALJ must evaluate the following, in sequence:

> (1) whether the claimant is currently [un]employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the [Commissioner]; (4) whether the claimant can perform her past work; and (5) whether the claimant is capable of performing work in the national economy.

*Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000), *as amended* (Dec. 13, 2000) (citations omitted).  "If a claimant satisfies steps one, two, and three, she will automatically be found disabled.  If a claimant satisfies steps one and two, but not three, then she must satisfy step four.  Once step four is satisfied, the burden shifts to the SSA to establish that the claimant is capable of performing work in the national economy."  *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

After step three, but before step four, the ALJ must determine a claimant's residual functional capacity ("RFC") by evaluating "all limitations that arise from medically determinable impairments, even those that are not severe."  *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009).  In doing so, the ALJ "may not dismiss a line of evidence contrary to the ruling."  *Id.*  The ALJ uses the RFC at step four to determine whether the claimant can perform her own past relevant work and if not, at step five to determine whether the claimant can perform other work.  *See* 20 C.F.R. § 404.1520(a)(4)(iv), (v).  The burden of proof is on the claimant for steps one through four; only at step five does the burden shift to the Commissioner.  *See Clifford*, 227 F.3d at 868.

If the ALJ committed no legal error and substantial evidence exists to support the ALJ's decision, the Court must affirm the denial of benefits.  *Stephens*, 888 F.3d at 327.  When an ALJ's decision does not apply the correct legal standard, a remand for further proceedings is usually the appropriate remedy.  *Karr v. Saul*, 989 F.3d 508, 513 (7th Cir. 2021).  Typically, a remand is also

appropriate when the decision is not supported by substantial evidence.  *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 355 (7th Cir. 2005).  "An award of benefits is appropriate only where all factual issues have been resolved and the 'record can yield but one supportable conclusion.'"  *Id.* (quoting *Campbell v. Shalala*, 988 F.2d 741, 744 (7th Cir. 1993)).

## II.
### BACKGROUND

Jason M. was 46 years old on September 1, 2016, the alleged onset date of disability, and has a high-school education.  [Filing No. 15-2 at 26.]  He previously worked as an antenna installer, a cashier, a waiter, and a scheduler.  [Filing No. 15-2 at 26.]  Jason M.'s original application alleges that he can no longer work because of balance/vertigo problems, depression, fibromyalgia, HIV, heart problems, and seizures. [2]  [Filing No. 15-2 at 2.]

The ALJ followed the five-step sequential evaluation set forth in 20 C.F.R. § 404.1520(a)(4) and concluded Jason M. was not disabled.  Specifically, the ALJ found as follows:

- At Step One, Jason M. had not engaged in substantial gainful activity[3] during the period at issue.  [Filing No. 15-2 at 18.]

- At Step Two, Jason M. has the following severe impairments: "lumbar degenerative disc disease, fibromyalgia, neuropathy, asymptomatic HIV, history of seizure disorder, syncope, affective disorder (depression versus bipolar), anxiety disorder, post-traumatic stress disorder (PTSD), and personality disorder."  [Filing No. 15-2 at 18.]  Jason M. had the following non-severe impairments: "hyperlipidemia, hypotension, restless leg syndrome, tobacco abuse, and methamphetamine abuse."  [Filing No. 15-2 at 18.]

---

[2] The relevant evidence of record is amply set forth in the parties' briefs and need not be repeated here.  Specific facts relevant to the Court's disposition of this case are discussed below.

[3] Substantial gainful activity is defined as work activity that is both substantial (*i.e.*, involves significant physical or mental activities) and gainful (*i.e.*, work that is usually done for pay or profit, whether or not a profit is realized).  20 C.F.R. § 404.1572(a).

- At Step Three, Jason M. did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  [Filing No. 15-2 at 21.]

- After Step Three but before Step Four, Jason M. had the RFC "to perform light work as defined in CFR 404.1567(b) with the following additional limitations:  can occasionally climb ramps and stairs; can occasionally balance, stoop, kneel, crouch, and crawl; can occasionally be exposed to extreme heat, extreme cold and vibration; can never climb ladders, ropes, or scaffolds; can never be exposed to unprotected heights or dangerous moving machinery and can never operate a motor vehicle at work; can understand and remember simple instructions; can sustain attention and concentration to complete simple tasks with regular breaks every two hours; can interact as needed with supervisors and coworkers and can have routine, superficial interaction with the public; and can adapt to routine work conditions and occasional work place changes." [Filing No. 15-2 at 23-24.]

- At Step Four, relying on the testimony of the vocational expert ("VE") and considering Jason M.'s RFC, he was unable to perform his past work as an antenna installer, cashier, waiter, or scheduler.  [Filing No. 15-2 at 25-26.]

- At Step Five, relying on the VE's testimony and considering Jason M.'s age, education, work experience, and RFC, there are jobs existing in significant numbers in the national economy that he could perform, such as an inspector, marker, or cleaner.  [Filing No. 15-2 at 27.]

### III.
### DISCUSSION

Jason M. advances the following arguments on appeal: (1) the ALJ failed to address a medical opinion; (2) the RFC failed to adequately address limitations in the areas of concentration, persistence, and pace; (3) the ALJ failed to adequately consider whether Jason M.'s fibromyalgia met or medically equaled a listing and include limitations posed by his fibromyalgia; (4) the ALJ erred in evaluating Jason M.'s subjective symptoms; and (5) because 42 U.S.C. § 902(a)(3) violates separation-of-powers principles under recent Supreme Court jurisprudence, he is entitled to a new hearing.

## A.  Dr. Clarke's PTSD Evaluation

Jason M. first argues that the ALJ erred by not addressing the medical opinion evidence of clinical psychologist, Dr. Shakesha Clarke, PhD, who completed a PTSD questionnaire for Jason M.  [Filing No. 22 at 12.]  He says that "[t]he ALJ failed to acknowledge Dr. Clarke's opinion entirely in his decision and did not discuss any medical evidence after January 2020."  [Filing No. 22 at 14.]  Jason M. argues that the ALJ was required to address all medical opinions in the record, and if the ALJ rejects a medical opinion, the ALJ's "decision must set forth the reasoning for doing so with legally sufficient rationale."  [Filing No. 22 at 14.]  Jason M. says Dr. Clarke's February 2020 evaluation "opined that [his] PTSD and related symptoms created an occupational impairment with re[duc]ed reliability and reactivity and [that] his symptoms were in the severe range impacting his occupational functioning."  [Filing No. 22 at 15.]  Jason M. says this error is not harmless because it caused a "defective (i.e., inaccurate) RFC finding" and because the VE testified that no jobs were available for an individual off task more than 15 percent of the workday or absent two days per month.  [Filing No. 22 at 14-15.]

In response, the Commissioner argues that the document cited by Jason M. from Dr. Clarke is "not a medical opinion under the [SSA] regulations, and therefore the ALJ did not err by declining to discuss it."  [Filing No. 23 at 23.]  This is so, the Commissioner argues, because "[t]he PTSD questionnaire completed by Dr. Clarke contained no opinions about Plaintiff's ability to perform the 'mental demands of work activities,' as required by the regulations."  [Filing No. 23 at 23.]  The Commissioner says that "[w]hile Dr. Clarke checked boxes indicating [Jason M.] was experiencing some symptoms of PTSD, she did not provide any indication of how these symptoms affected his ability to function in the workplace."  [Filing No. 23 at 23.]  The Commissioner further argues that even if the ALJ erred in not discussing Dr. Clarke's questionnaire, that failure is

harmless error "because the only objective observations on the form were unremarkable and did not support an argument for any further restrictions than were assessed [in the RFC]."  [Filing No. 23 at 23.]  The Commissioner notes that "the mental status exam conducted by Dr. Clarke showed [Jason M.] to be cooperative and pleasant, with normal speech, appropriate attitude, intellectual functioning within normal limits, logical and goal-directed thoughts, appropriate thought content, and no current suicidal or homicidal ideations."  [Filing No. 23 at 23-24.]

In reply, Jason M. disputes the Commissioner's contention that Dr. Clarke's assessment is not a medical opinion, noting that the document "specifically stated [that Jason M.'s] symptoms were in the severe range with impact on emotional, social, and aspects of his *occupational* functioning and opined he has difficulty establishing and maintaining effective work and social relationships and difficulty adapting to stressful circumstances, including work or work like settings."  [Filing No. 24 at 9 (emphasis original).]

The Court begins with an analysis of the document at issue.  Dr. Clarke evaluated Jason M. in February 2020 at a Veterans Affairs ("VA") medical facility in Philadelphia for PTSD.  [Filing No. 15-8 at 239-47.]  Dr. Clarke generated a document entitled "Initial Post Traumatic Stress Disorder (PTSD) Disability Benefits Questionnaire," which is a Veteran's Administration questionnaire consisting of short answer and multiple-choice questions to be completed by a VA examiner for purposes of evaluating a veteran for VA disability.  In the questionnaire, Dr. Clarke recounted Jason M.'s report that in 1990 while on active duty with the Army, he was sexually assaulted and abandoned in a desert for a day, walking 8.5 hours to return to his base.  [Filing No. 15-8 at 242-44.]  Jason M. relayed that following the assault, other soldiers threatened his life.  [Filing No. 15-8 at 242.]  Using PTSD diagnostic criteria from the Diagnostic and Statistical Manual of Mental Disorders, 5th ("DSM-5"), Dr. Clarke determined that this event has given rise

to PTSD in Jason M. [Filing No. 15-8 at 245-48.] Relevant here, Dr. Clarke completed sections

of the questionnaire as follows:

---

Criterion D: Negative alterations in cognitions and mood associated with
             the traumatic event(s), beginning or worsening after the
             traumatic event(s) occurred, as evidenced by two (or more) of
             the following:

             [X] Persistent negative emotional state (e.g., fear, horror,
                 anger, guilt, or shame).
             [X] Markedly diminished interest or participation in
                 significant activities.
             [X] Feelings of detachment or estrangement from others.
             [X] Persistent inability to experience positive emotions
                 (e.g., inability to experience happiness, satisfaction, or
                 loving feelings.)

Criterion E: Marked alterations in arousal and reactivity associated with
             the traumatic event(s), beginning or worsening after the
             traumatic event(s) occurred, as evidenced by two (or more) of
             the following:

             [X] Irritable behavior and angry outbursts (with little or no
                 provocation) typically expressed as verbal or physical
                 aggression toward people or objects.
             [X] Reckless or self-destructive behavior.
             [X] Hypervigilance.
             [X] Exaggerated startle response.
             [X] Problems with concentration.
             [X] Sleep disturbance (e.g., difficulty falling or staying
                 asleep or restless sleep).

Criterion F:

             [X] Duration of the disturbance (Criteria B, C, D, and E) is
                 more than 1 month.

Criterion G:

             [X] The disturbance causes clinically significant distress or
                 impairment in social, occupational, or other important
                 areas of functioning.

8

```
5. Symptoms
   ----------
For VA rating purposes, check all symptoms that actively apply to the
Veteran's diagnoses:

   [X] Depressed mood
   [X] Anxiety
   [X] Suspiciousness
   [X] Panic attacks that occur weekly or less often
   [X] Chronic sleep impairment
   [X] Disturbances of motivation and mood
   [X] Difficulty in establishing and maintaining effective work and social
       relationships
   [X] Difficulty in adapting to stressful circumstances, including work or a
       worklike setting
   [X] Suicidal ideation
   [X] Persistent delusions or hallucinations
```

[Filing No. 15-8 at 246-47.]  Dr. Clarke concluded with the following written narrative:

> The veteran met criteria for PTSD with Psychotic Features IAW DSM 5 that is at least as likely as not secondary to the physical and sexual assault he experienced during his time in service.  He also reported intermittent depressive symptoms that are secondary to PTSD and were categorized under "persistent negative emotional state."  The veteran was also previously diagnosed with Stimulant and Cannabis Use Disorders that were also deemed secondary to PTSD and have been in remission.  Symptoms were rated in the severe range with impact on emotional, social, and aspects of his occupational functioning.

[Filing No. 15-8 at 248.]  The VA found Jason M. to be 100% service-connected disabled because of his PTSD.  [*See* Filing No. 15-2 at 45-46; Filing No. 15-8 at 150.]  The ALJ's decision does not reference the PTSD questionnaire completed by Dr. Clarke nor the VA's disability rating.  [*See generally* Filing No. 15-2 at 16-27.]

Two SSA regulations are implicated by Jason M.'s arguments concerning Dr. Clarke.  First, under 20 C.F.R. § 404.1504, the VA's assessment of whether an individual is entitled to VA benefits "is not binding on [the SSA]" and the SSA "will not provide any analysis in our determination or decision about a decision made by the [VA] … about whether you are disabled …, employable, or entitled to any benefits."  *Id.*  However, the SSA "will consider all of the supporting evidence underlying the [VA's] … decision that we receive as evidence in your claim

in accordance with § 404.1513(a)(1) through (4)." *Id.* Thus, the ALJ had no obligation to address the VA's disability rating of Jason M.

Second, a "medical opinion" is defined as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations" in "[y]our ability to perform mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting." 20 C.F.R. § 404.1513(a)(2)(ii). This definition of "medical opinion" became effective for claims filed on or after March 27, 2017. A "medical opinion" is distinct from "objective medical evidence," which concerns "medical signs, laboratory findings, or both." 20 C.F.R. § 404.1513(a)(1). Thus, to constitute a medical opinion under this regulation, Dr. Clarke's statement must satisfy two elements: "(1) it must be a statement from a medical source about what [Jason M.] could still do despite his limitations; and (2) it must express [Jason M.'s] impairment-related limitations or restrictions in terms of his ability to perform certain work demands." *Wallender v. Saul*, 2021 WL 734098, at *6 (E.D. Wis. Feb. 25, 2021). The ALJ has no duty to examine or evaluate treatment or diagnostic documents using the factors in 20 C.F.R. § 404.1520c, absent a medical opinion. *Kernstein v. Kijakazi*, 2021 WL 5356103, at *3 (N.D. Ind. Nov. 17, 2021).

The questionnaire completed by Dr. Clarke notes that Jason M. has "[d]ifficulty in establishing and maintaining effective work and social relationships" and "[d]ifficulty in adapting to stressful circumstances, including work or a worklike setting." [Filing No. 15-8 at 247.] But these statements are not work-related functional limitations, but rather check-box categories of symptoms provided in a diagnostic context. The document lacks a discussion of what Jason M. could still do despite his impairments. *See* 20 C.F.R. § 404.1513(a)(2). Instead of assessing his

impairment's impact on his ability to work, the document reflects Jason M.'s diagnostic criteria and symptoms supportive of a diagnosis of PTSD and is not a "medical opinion," but rather "other medical evidence" under 20 C.F.R. § 404.1513(a)(3).  The majority of district courts[4] to have considered the issue have agreed.  *See, e.g.*, *Melissa S. v. Comm'r of Soc. Sec.*, 2022 WL 1091608, at *4 (N.D.N.Y. Apr. 12, 2022) (finding VA PTSD questionnaire was not a medical opinion under SSA regulations); *Foster v. Kijakazi*, 2022 WL 412729, at *6 (N.D. Iowa Jan. 25, 2022) (same); *Stout v. Kijakazi*, 2021 WL 4459732, at *4 (E.D. Mo. Sept. 29, 2021) (same); *Scott L. v. Saul*, 2021 WL 1574451, at *3 (D. Me. Apr. 21, 2021) (same), *R. &R. adopted*, 2021 WL 3234592 (D. Me. July 29, 2021); *Shawn Ann J. v. Comm'r of Soc. Sec.*, 2021 WL 733804, at *5 (N.D.N.Y. Feb. 25, 2021) (same).  *But see Benally v. Kijakazi*, 2022 WL 1303126, at *5 (D.N.M. May 2, 2022) (finding certain portions of VA PTSD questionnaire to be a medical opinion); *Jonathan W. v. Saul*, 2021 WL 1163632 (N.D.N.Y. Mar. 26, 2021) (finding VA PTSD report a "medical opinion" because it addressed certain aspects of claimant's ability to perform work).  Because the VA's PTSD questionnaire is "other medical evidence," the ALJ did not have a specific duty to consider it in reaching a decision on Jason M.'s disability claim.  *See Melissa S.*, 2022 WL 1091608, at *4.

In any event, assuming *arguendo* that the ALJ erred by not discussing the VA PTSD questionnaire, this failure would be harmless error.  *See McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011) (explaining that administrative error may be harmless and thus a court ought not remand a case to the ALJ where it is convinced that the ALJ would reach the same result).  Here, Dr. Clarke's statements that Jason M. has "[d]ifficulty in establishing and maintaining effective work and social relationships" and "[d]ifficulty in adapting to stressful circumstances, including

_____

[4] Because the current regulation only impacted applications filed after March 27, 2017, the Seventh Circuit has yet to consider the question.

work or a worklike setting" do not support further limitations than those already included in the RFC.

For all of these reasons, the ALJ's failure to discuss Dr. Clarke's statements included with the VA PTSD questionnaire does not require remand.

### B. Concentration, Persistence, and Pace Limitations

Jason M. next contends that the ALJ's RFC determination fails to adequately address his limitations in the area of concentration, persistence, and pace ("CPP"). He argues that although the ALJ found Jason M. to be "moderately" limited in CPP, the ALJ failed to translate this finding "into a detailed assessment and limitation in the RFC finding." [Filing No. 22 at 16.] He contends that "[t]he ALJ failed to include, implicitly or explicitly, these assessed limitations in the area of concentration and task persistence" and instead provided a "generic, conclusory finding that [Jason M.] would be able to understand and remember simple instructions and tasks." [Filing No. 22 at 16.] Jason M. argues that the limitation in the RFC that Jason M. be limited to jobs with "simple instructions" and "simple tasks with regular breaks every two hours" does not address his moderate limitations in CPP. Jason M. cites Seventh Circuit case law for the proposition that limiting a claimant to simple tasks does not adequately account for a moderate limitation in CPP. [Filing No. 22 at 17-18 (citing *Stewart v. Astrue*, 561 F.3d 679 (7th Cir. 2009) and *Winsted v. Berryhill*, 915 F.3d 466 (7th Cir. 2019)).]

In response, the Commissioner says that the ALJ was only required to "include limitations in his RFC determination that were supported by the medical evidence and that the ALJ found to be credible" and that Jason M.'s "arguments to the contrary rely on outdated case law and insufficient evidence to mandate remand." [Filing No. 23 at 24.] The Commissioner contends that the Seventh Circuit has "rejected [the] notion that certain RFC restrictions can never

accommodate moderate limitations" in CPP, and instead, "the determination of whether specific RFC restrictions accommodate a particular claimant's demonstrated limitations is fact-driven and individual to the record in that case." [Filing No. 23 at 25] (citing *Burmester v. Berryhill*, 920 F.3d 507 (7th Cir. 2019), *Jozefyk v. Berryhill*, 923 F.3d 492 (7th Cir. 2019), and *Urbanek v. Saul*, 796 F. App'x 910 (7th Cir. 2019)).] Furthermore, the Commissioner argues, the medical evidence "does not provide substantial support for [Jason M.'s] argument that greater limitations were necessary" and notes that Jason M. relies heavily on the VA PTSD form completed by Dr. Clarke, which does "not indicate to what degree [symptoms of irritable behavior and problems with concentration] would affect [Jason M.'s] ability to perform full-time work." [Filing No. 23 at 26.]

In reply, Jason M. says the Seventh Circuit cases cited by the Commissioner are distinguishable because Jason M. has cited to medically supported deficits. [Filing No. 24 at 10.] He also contends that "the limitation to breaks every two hours is not a limitation at all" but rather "a standard break given to every employee." [Filing No. 24 at 9.]

The RFC "represents the maximum a person can do—despite his limitations—on a regular and continuing basis." *Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013). A court must uphold an ALJ's RFC determination "if the evidence supports the decision and the ALJ explains his analysis of the evidence with enough detail a clarity to permit a meaningful review." *Arnett v. Astrue*, 676 F.3d 586, 591-92 (7th Cir. 2012).

CPP "refers to the abilities to focus attention on work activities and stay on task at a sustained rate." 20 C.F.R. Pt. 404, Supt. P, App. 1 § 12.00E(3). "[W]hen an ALJ finds there are documented limitations of [CPP], the hypothetical question presented to the VE must account for these limitations." *Winsted v. Berryhill*, 923 F.3d 472, 476 (7th Cir. 2019). Generally, employing terms like "simple, repetitive tasks" on their own will not necessarily properly account for

problems captured by CPP.  *Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2019).  This is because "observing that a person can perform simple and repetitive tasks says nothing about whether the individual can do so on a sustained basis, including, for example, over the course of a standard eight-hour work shift."  *Id.*  Thus, the RFC and hypotheticals "must account for both the complexity of the task and the claimant's ability to stick with a task over a sustained period." *Warren v. Colvin*, 565 F. App'x 540, 544 (7th Cir. 2014).

Here, the ALJ adopted the following mental RFC: "can understand and remember simple instructions; can sustain attention and concentration to complete simple tasks with regular breaks every two hours; can interact as needed with supervisors and coworkers and can have routine, superficial interaction with the public; and can adapt to routine work conditions and occasional work place changes."  [Filing No. 15-2 at 23-24.]  The ALJ included this mental RFC in the hypothetical to the VE, who responded that with these limitations (and other physical limitations and educational limitations), jobs existed in the national economy.  [Filing No. 15-2 at 48-49.] The ALJ then added the additional limitation to the hypothetical that the individual "would be off task 15% of the workday."  [Filing No. 15-2 at 49.]  The VE testified that no jobs would be available in the national economy with this additional limitation.  [Filing No. 15-2 at 50.]

The Court pauses to observe that no experts provided an opinion about Jason M.'s mental RFC.  No state agency consultants opined about Jason M.'s mental RFC because, as the ALJ's decision notes, "[t]he State agency medical and psychological consultants found the medical evidence of record to be insufficient to evaluate the claimant's claim ….  Thus, no opinion regarding the claimant's capabilities was made by the state agency consultants.  Similarly, there are no opinions regarding the claimant's capabilities found elsewhere in the medical record." [Filing No. 15-2 at 25.]  Instead, the ALJ appears to have relied on the functional report completed

by Jason M. in forming the mental RFC.  [*See* Filing No. 15-2 at 23 ("With regard to concentrating, persisting or maintaining pace, the claimant has a moderate limitation.  He reported that he can only pay attention for '30 seconds to a minute' and that he does not finish what he starts.").]

The ALJ's limitation of Jason M. to simple instructions and simple tasks with regular breaks every two hours fails to articulate a logical bridge between the ALJ's finding of a moderate limitation in the CPP and the mental RFC.  The Seventh Circuit has recognized that while there are no RFC "magic words" that an ALJ must use, the ALJ must rationally articulate the grounds for his decision so that courts may afford the claimant a meaningful review of the ALJ's findings. *See Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002).  Here, the ALJ found that Jason M. had a moderate CPP limitation but failed to articulate, beyond the boilerplate, routine language frowned upon by the Seventh Circuit, how this limitation impacted his functional capacity. Notably, the RFC and accompanying explanation do not address Jason M.'s ability to stay on task for a sustained period, even though the ALJ acknowledged that Jason M. reported that he can only pay attention for 30 seconds to a minute and that he does not finish what he starts.  In short, the Court is unable to construct a logical bridge between the moderate limitation finding and the RFC without a more robust explanation from the ALJ.  *See Ian K. v. Kijakazi*, No. 1:20-1918-SEB-MPB, 2021 WL 4177202, at *4-5 (S.D. Ind. Aug. 13, 2021), *report and recommendation adopted*, 2021 WL 4171429 (S.D. Ind. Sept. 14, 2021) (finding RFC failed to adequately address moderate limitations in CPP where the RFC limited claimant to simple, routine tasks free of fast-paced production).

The Commissioner's citations to *Burmester v. Berryhill*, 920 F.3d 507 (7th Cir. 2019), *Jozefyk v. Berryhill*, 923 F.3d 492 (7th Cir. 2019) (per curiam), and *Urbanek v. Saul*, 796 F. App'x 910 (7th Cir. 2019) do not save the ALJ's shortfall here.  Unlike the cases cited by the

Commissioner, the ALJ here did not rely on any medical opinion that Jason M.'s moderate CPP limitation was adequately encompassed by the RFC.  *See Burmester*, 920 F.3d at 511 (rejecting claimant's challenge to CPP "boilerplate" where ALJ relied on opinion of a medical expert who "translate[d] … findings into an RFC determination"); *Jozefyk*, 923 F.3d at 498 (finding CPP limitations in RFC were supported by agency doctor's opinion); *Urbanek*, 796 F. App'x at 914 (finding ALJ adequately accounted for claimant's CPP  limitations in RFC because the ALJ relied on testimony of medical expert to formulate the RFC).  Here, there is no comparable opinion in the record.

The RFC's inclusion of "regular breaks every two hours" does not, without additional explanation, account for a CPP limitation.  That is so for two reasons.  First, this limitation does not articulate the length of the break needed.  Second, the Commissioner has suggested in other cases that "normal breaks occur every two hours during a regular 8-workday," so a break every two hours, without further description, is not a limitation to the normal workday.  *See Warren v. Colvin*, 2013 WL 1196603, at *5 (N.D. Ill.  Mar. 22, 2013) (citing *Braithwaite v. Comm'r of Soc. Sec.*, 2011 WL 1253395, at *5 n.4 (E.D. Cal. Mar. 31, 2011)).  *See also Amy R. v. Kijakazi*, 2022 WL 796332, at *4 (S.D. Ind. Mar. 15, 2022) ("[T]he ALJ's determination that Claimant could 'sustain attention and/or concentration for at least two-hour periods at a time and for 8 hours in the workday' essentially amounts to no limitation at all. *** It therefore does not make sense that Claimant, who has moderate limitations in her ability to maintain attention and concentration, would require the same frequency of breaks as a typical worker.") (internal quotation marks omitted).

The Commissioner's contention that Jason M.'s CPP argument fails because he has not identified a medical opinion opining that he has greater CPP limitations than those adopted by the

ALJ has some appeal.  The difficulty in applying this harmless-error-type rule here is the lack of explanation provided by the ALJ.  The ALJ seemed to recognize Jason M.'s CPP challenges with respect to staying on task when, in formulating an additional hypothetical for the VE, the ALJ incorporated the additional limitation of a person being off-task 15% of the time.  [Filing No. 15-2 at 49.]  The VE opined that a person so limited would lack the functional capacity to sustain any employment.  [Filing No. 15-2 at 50.]  But, the ALJ failed to incorporate this opinion anywhere in the RFC and explain why the ALJ found this limitation inapplicable to Jason M., "leaving the RFC altogether uniformed by considerations of off-task time or unplanned leave." *Crump*, 932 F.3d at 570.  The reviewing court is thus left to guess why the ALJ deemed Jason M. to have a moderate limitation in CPP and what limitations (if any) with respect to time on task that limitation caused. *See Kukec v. Berryhill*, 2017 WL 5191872, at *4 (N.D. Ill. Nov. 9, 2017) (remanding where ALJ posed 15%-off-task hypothetical to VE and then "failed to come to any conclusion regarding the off-task time [the ALJ] asked the VE to consider"); *Jacob D. v. Kijakazi*, 2021 WL 3674610, at *5 (N.D. Ill. Aug. 19, 2021) ("While an ALJ is not bound to any hypothetical, it is clear here the ALJ considered the issue of off-task time but then failed to provide any analysis of whether … [claimant] was limited by any off-task allowances and, if so, for how long."); *Pamela B. v. Saul*, 2021 WL 2411391, at * 8 (N.D. Ind. June 14, 2021) ("The ALJ was required to, at a minimum, discuss the VE's testimony concerning off-task time . . . and explain why … [claimant] would not be off-task more than 10 percent of the day.").

In short, the Court is left guessing as to how the ALJ determined that limiting Jason M. to simple tasks would sufficiently address his moderate CPP limitations.  It may well be the case that the limitation is sufficient, but the Court is unable to trace the reasoning as to why the ALJ ultimately concluded that Jason M. would not need a time off task accommodation in his RFC.

Accordingly, remand is required for proper consideration and explanation of the RFC finding, including Jason M.'s limitations in CPP.

### C.  Fibromyalgia and Related Limitations

Jason M. next argues that the ALJ erred in addressing his fibromyalgia.  He argues that even though the ALJ found that his fibromyalgia was a severe impairment, the ALJ wrongfully minimized its effects and failed to follow SSR 12-2p, which provides guidance on evaluating fibromyalgia in disability claims.  Jason M. also contends that the ALJ failed to follow SSR 12-2p when determining whether his condition met or medically equaled a listed impairment.

#### 1.  Listing Analysis

First, the Court examines the ALJ's consideration of Jason M.'s fibromyalgia with respect to the determination that he did not meet a listing.  Because fibromyalgia is not a listed impairment, SSR 12-2p requires an ALJ to determine whether a claimant's fibromyalgia medically equals a listing alone or in combination with another medically determinable impairment and adequately articulate the foundation for the conclusions.  *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002).  Jason M. bears the burden of demonstrating that he meets the criteria specified in a listing. *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006).

The ALJ adequately articulated the foundation for his conclusion that Jason M. did not meet a listing, despite his finding that his fibromyalgia was a severe impairment.  The ALJ analyzed whether Jason M. met relevant listings, including 1.04 (disorders of the spine) and 11.14 (neuropathy).  [Filing No. 15-2 at 20-21.]  While the ALJ did not mention Jason M.'s fibromyalgia in his listings analysis, he described Jason M.'s fibromyalgia symptoms elsewhere in his opinion and indicated that the limited medical evidence made available resulted in the absence of a medical opinion about Jason M.'s fibromyalgia.  The combination of the ALJ's consideration of the effects

of Jason M.'s fibromyalgia elsewhere in the decision, relevant listings, and the absence of an opinion from medical sources constitutes an adequate articulation for his conclusion that Jason M.'s fibromyalgia did not medically equal a listing alone or in combination with another medically determinable impairment.

### 2. SSR 12-2p and RFC Findings

Second, Jason M. contends that the ALJ "failed to conduct the required analysis under [SSR] 12-2p." [Filing No. 22 at 22.] Jason M. faults the ALJ for not "mention[ing] SSR 12-2p and the associated requirements." [Filing No. 22 at 22.] He says the ALJ "merely discusses objective treatment notes to discredit [Jason M.'s] report[ed limitations], which is not enough to discount subjective symptoms of pain caused by fibromyalgia." [Filing No. 22 at 22 (internal citations and quotation marks omitted).] Thus, he says that the RFC does not account for limitations attributable to his fibromyalgia. [Filing No. 22 at 20-21.]

As stated previously in this Entry, the RFC represents "the maximum a person can do," despite limitations, a reviewing court will generally uphold an RFC finding so long as evidence supports the decision, and the ALJ's explanation permits meaningful review. *See Arnett*, 676 F.3d at 591-92. SSR 12-2p adds a requirement to the ALJ's RFC determination when fibromyalgia is found. The rule requires that the ALJ "consider a longitudinal record whenever possible because the symptoms of [fibromyalgia] can wax and wane so that a person may have bad days and good days." SSR 12-2p; *Ingram v. Colvin*, 2014 WL 3704816, at *4 (C.D. Ill. July 25, 2014).

It is not entirely clearly what Jason M. is arguing in his brief as it relates to SSR 12-2p[5]

and what additional limitations he believes are supported.  The ALJ had this to say about Jason

M.'s limitations posed by fibromyalgia:

> Throughout the record the claimant was noted to be taking Lyrica for pain/fibromyalgia (Exhibit 1F, p. 3, 7, 10, 11; Exhibit 2F, p. 1, 4; Exhibit 4F, p. 2; Exhibit 5F, p. 1, 9, 11, 12, 15; Exhibit 11F, p. 209, 220, 221, 260. 342, 759, 798, 812), and, while most physical examinations found in the medical evidence of record are normal (Exhibit 2F, p. 2, 5; Exhibit 4F, p. 3), there are instances such as his July 2018 visit to Health First Family Care when he was found to have decreased rotation of his head and neck (Exhibit 5F, p. 14). Degenerative changes along the claimant's lower lumbar spine as well as grade 1 L5-S1 anterior spondylolisthesis were noted in imaging of May 2015 (Exhibit 1F, p. 13).  X-rays taken in January 2020 documented mild retrolisthesis of L4 on L5 related to moderate degenerative disc disease as well as grade 1 anterolisthesis of L5 on S1 related to moderate degenerative disc disease and facet arthropathy (Exhibit 11F, p. 100). In light of these imaging studies and physical examination findings relative to the claimant's spine, the undersigned finds that the claimant's degenerative disc disease, fibromyalgia, neuropathy, and HIV reasonably limit the claimant's residual functional capacity to light work with additional postural restrictions (occasionally climb ramps and stairs; occasionally balance, stoop, kneel, crouch, and crawl; can never climb ladders, ropes, or scaffolds) and a limitation of only occasional exposure to extreme heat, extreme cold and vibration. Further, as a result of the claimant's history of seizure disorder for which he takes Lamictal (Exhibit 1F, p. 9; Exhibit 5F, p. 9-10, 15-16; Exhibit 9F, p. 3-4; Exhibit 11F, p. 253, 297, 299), the undersigned further limits the claimant's residual functional capacity to provide that he can never be exposed to unprotected heights or dangerous moving machinery.

[Filing No. 15-2 at 25.]  Jason M.'s assertion that "the ALJ did not discuss the correlation between

[his] symptoms of fibromyalgia and his ability work" is plainly wrong.  [*See* Filing No. 22 at 22.]

Jason M.'s real complaint appears to be that the term "SSR 12-2p" does not appear in the ALJ's

decision, but that does not give rise to an error so long as the ALJ's reasoning encompasses the

requirements of the agency ruling, which it does here.  *See Pugh v. Bowen*, 870 F.2d 1271, 1274

---

[5] Much of SSR 12-2p is devoted to determining whether fibromyalgia is a medically determinable impairment, but here the ALJ found that it was.

(7th Cir. 1989).  Furthermore, Jason M. has not cited any a medical opinion or evidence supporting greater workplace restrictions related to his fibromyalgia than those included in the RFC.

In sum, the ALJ's findings related to Jason M.'s fibromyalgia were based on substantial evidence, he considered the longitudinal record, and he sufficiently explained his analysis.  Having done so, this Court is not permitted to overturn it.

### D.  Subjective Symptom Analysis

Jason M. next argues that the ALJ's credibility assessment under SSR 16-3p is flawed because the ALJ failed to account for special considerations warranted in connection with fibromyalgia and to acknowledge his good work history.  [Filing No. 22 at 24.]  Much of Jason M.'s argument on this front is confusing.  [See Filing No. 22 at 24-25 (discussing use of the word "credibility").]  In any event, the Court finds that the ALJ's subjective symptom analysis was not "patently wrong."  See Zoch, 981 F.3d at 601.  Nevertheless, because the Court is remanding for further consideration of other issues, the ALJ may wish to provide further explanation and analysis of Jason M.'s subjective symptoms.

### E.  Constitutional Challenge to the Authority of the ALJ and Appeals Council

Finally, Jason M. argues that the ALJ and Appeals Council lacked constitutional authority to rule on his DIB appeals because 42 U.S.C. § 902(a)(3), which calls for the Commissioner to serve a six-year term, subject to removal only for neglect or malfeasance, violates separation-of-powers principles.  [Filing No. 22 at 26-29.]  This argument is anchored in the Supreme Court's ruling in Seila Law LLC v. Consumer Fin. Prot. Bureau, __U.S.__, 140 S. Ct. 2183 (2020), in which the Supreme Court held that a law that called for the head of an executive agency to serve a longer term than the appointing president (and subject to removal only for neglect or malfeasance) violated separation-of-powers principles and was therefore unconstitutional.

Jason M. says that this violation "deprived [him] of a valid adjudicatory process."  Jason M. says that, as a result, his case should be "remanded for a *de novo* hearing before a new ALJ who does not suffer from the unconstitutional taint of having previously heard and decided this case when the ALJ had no lawful authority to do so." [Filing No. 22 at 29.]

The Commissioner concedes that 42 U.S.C. § 902(a)(3) violates the U.S. Constitution's separation of powers in the same manner as *Seila Law*, but says that this defect does not warrant the setting aside of the denial of benefits for numerous reasons.  [*See* Filing No. 23 at 7-18.]  In particular, the Commissioner argues that the Supreme Court's subsequent decision in *Collins v. Yellen*, __U.S.__, 141 S. Ct. 1761 (2021), clarified that even where an agency head removal violates separation of powers, the claimant must show that the removal provision actually impacted the handling of his disability claim.  [Filing No. 23 at 7-13.]  The Commissioner next argues that remedial doctrines of harmless error, *de facto* officer, and the rule of necessity, as well as prudential considerations support denying Jason M.'s constitutional claim.  [Filing No. 23 at 13-18.]

In reply, Jason M. says he was injured by the separation of powers violations because "he did not receive a constitutionally valid hearing adjudication" from the ALJ or the Appeals Council. [Filing No. 24 at 4.] Jason M. he also asserts that he is not required to establish that the separation-of-powers violation caused him harm because in such cases "harm is presumed." [Filing No. 24 at 5.]

At this time, the only federal Court of Appeals to have squarely addressed this question in relation to the SSA is the Ninth Circuit.  In *Kaufmann v. Kijakazi*, __F.4th__, 2022 WL 1233238 (9th  Cir. Apr. 27, 2022), the Ninth Circuit rejected claimant's contention that the separation-of-powers violation in § 902(a)(3) voided claimant's unfavorable decision such that a new hearing

was required.  First, the Court found that the "removal provision [in § 902(a)(3)] is severable from the remainder of the statute." *Id.* at *4.  "The remaining provisions of the [Social Security] Act are capable of fully independent function, and nothing in the text, structure, or history of the statute makes it evident that Congress would have preferred, as an alternative to a Commissioner who is removable at will, no Social Security Administration at all." *Id.*

Turning next to the appropriate remedy for a claimant whose appeal was denied while then SSA Commissioner Saul served under an unconstitutional removal provision, the court held that "[a] party challenging an agency's past actions must … show how the unconstitutional removal provision *actually harmed* the party—for example, if the President would have removed the agency's head but for the provision or, alternatively, if the agency's head 'might have altered his behavior in a way that would have benefited' the party." *Id.*  at *5 (quoting *Collins*, 141 S. Ct. at 1789).  "Claimant therefore must demonstrate that the unconstitutional provision actually caused her harm.  Absent a showing of harm, we refuse to unwind the decision below." *Id.* (internal citations, alterations, and quotation marks omitted).  The Ninth Circuit provided the following actual harm examples: "the President took an interest in [the claimant's] claim" or "that the Commissioner directed the Appeals Council [or the ALJ] to decide [claimant's] case in a particular way because of the statutory limits on the President's removal authority." *Id.*

The Ninth Circuit's decision falls in line with Justice Kagan's concurrence in *Collins*, which addressed potential SSA challenges like that advanced by Jason M.:

> The majority's remedial holding limits the damage of the Court's removal jurisprudence.  As the majority explains, its holding ensures that actions the President supports—which would have gone forward whatever his removal power—will remain in place. *** Similarly, the majority's approach should help protect agency decisions that would never have risen to the President's notice. Consider the hundreds of thousands of decisions that the Social Security Administration (SSA) makes each year.  The SSA has a single head with for-cause removal protection; so a betting person might wager that the agency's removal

provision is next on the chopping block. *** But given the majority's remedial analysis, I doubt the mass of SSA decisions—which would not concern the President at all—would need to be undone. That makes sense.

*Collins*, 141 S. Ct. at 1801-02, (Kagan, J., concurring in part and concurring in the judgment). Perhaps unsurprising in light of Justice Kagan's comments, every district court to have considered the question in this Circuit has found similarly. *See, e.g.*, *Klawitter v. Kijakazi*, 2022 WL 842915, at *6 (W.D. Wis. Mar. 22, 2022) ("Klawitter argues that the decision to deny her benefits was made using a constitutionally illicit process, but she has failed to articulate any basis for finding that she was harmed by the Social Security Administration's structure or show that the relevant statutory removal restriction caused the denial of her claim."); *Michelle D. v. Kijakazi*, 2022 WL 972280, at *6 (N.D. Ill. Mar. 31, 2022) (rejecting claimant's constitutional challenge because "there's nothing to suggest that section 902(a)(3)'s limits on the President's removal authority had any bearing on this case"); *Travis A. C. v. Comm'r of Soc. Sec.*, 2022 WL 1422262, at *6 (S.D. Ill. May 5, 2022) ("Because [the claimant] has failed to demonstrate any connection between the limitation on the President's removal power and the denial of his application for disability benefits, this argument fails.").

The Court applies the same analysis as the Ninth Circuit and its sister district courts within this Circuit and finds that Jason M. has failed to show that the separation-of-powers violation imposed an actual impact on the outcome of his case. The Court has not located any authority supporting Jason M.'s argument that the separation-of-powers violation standing alone requires reversal, a *de novo* hearing, or the assignment of a new ALJ, and the Court declines to extend *Seila Law* and *Collins* in such a fashion.

Therefore, the Court rejects Jason M.'s assignment of error as it relates to the constitutionality of § 902(a)(3).

# IV.
## CONCLUSION

For the reasons detailed above, the Court **REVERSES** the ALJ's decision denying Jason

M. benefits and **REMANDS** this matter for further proceedings pursuant to 42 U.S.C. § 405(g)

(sentence 4) as detailed above.  Final judgment will issue by separate entry.

Date: 6/9/2022

Mario Garcia
United States Magistrate Judge
Southern District of Indiana

**Distribution via ECF to all counsel of record.**